| | | |
|---|---|---|
| CONCERTED CARE GROUP BALTIMORE, LLC<br>428 E. 25th Street<br>Baltimore, Maryland 21218 | *<br>*<br>* | IN THE<br><br>CIRCUIT COURT<br><br>FOR |
| Plaintiff, | * | BALTIMORE CITY |
| v. | * | |
| NETSMART TECHNOLOGIES, INC.<br>4950 College Boulevard,<br>Overland Park, Kansas 66212 | * | Case No: _____ |
| | * | |
| SERVE ON:<br>Resident Agent<br>The Corporation Trust Incorporated<br>351 West Camden Street<br>Baltimore, Maryland  21201 | *<br><br>* | |
| Defendant. | *<br>* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT

Plaintiff Concerted Care Group Baltimore, LLC, by its attorneys, hereby files this Complaint against Defendant Netsmart Technologies, Inc., and in support states:

### I. The Parties

1. Plaintiff Concerted Care Group Baltimore, LLC ("CCG") is a Maryland limited liability company with its principle place of business at 428 E. 25th Street, Baltimore, Maryland 21218. CCG's sole member is HoldCo, LLC, a Delaware limited liability company.

2. Defendant Netsmart Technologies, Inc. ("Netsmart") is a Delaware corporation with its principal place of business at 4950 College Boulevard, Overland Park, Kansas 66212.

II.     **Jurisdiction and Venue**

3.      This Court has jurisdiction over this case pursuant to Md. Code Ann., Cts. & Jud. Proc. Art. §§1-501, 6-102(a) and 6-103(b)(2).

4.      Venue is appropriate in this Court pursuant to Md. Cts & Jud. Proc. Art §6-202(3).

III.    **Factual Background**

A.      CCG's Contract with Netsmart

5.      CCG is a company providing comprehensive integrated medical care primarily focused on persons recovering from addiction and mental health conditions. The CCG integrated healthcare platform includes: addiction treatment, including multiple medication management, psychiatric and mental health counseling, primary care, laboratory services, and health home population care management. CCG's business and financial model is premised upon building, opening, and operating multiple new integrated addiction treatment centers in multiple markets. The first of these medical centers, CCG Baltimore, was targeted initially to open in the fall of 2014.

6.      CCG's complex healthcare records, financial records, and billing operations require a sophisticated, integrated, seamless Electronic Health Record system ("EHR"), buttressed by a clearly defined and well-structured Revenue Cycle Management

2

("RCM") billing and collections operation, including highly competent disciplined RCM management and staff.

7. Beginning in late fall of 2013, CCG Management examined and considered multiple EHR software and RCM services providers, and in the spring of 2014 selected the Netsmart myEvolv Electronic Healthcare Records software as its core business platform, including as an Addendum to its agreement with Netsmart a comprehensive Revenue Cycle Management Scope of Services. During the extensive discussions during the selection process and prior to executing a written agreement, CCG made clear to Netsmart that the software needed to support CCG's healthcare, business and financial performance models, timelines and growth strategies, including the scheduled opening of CCG Baltimore in the fall of 2014.

8. In those discussions, CCG further made clear to Netsmart the requirement that the entire myEvolv EHR software suite be ready for full operational deployment on "Day 1" of CCG's business operations, including myEvolv software capabilities to support Multi-Med Addictions, Mental Health, Primary Care and Health Home programs, and complete RCM billing services.

9. In response to this unequivocal, clearly-expressed CCG operational requirement, Netsmart represented to CCG that myEvolv was available, tested, in use and operating in other comparable centers, and fully capable of meeting CCG's business requirements. To that effect, Jim Conway, Account Development Strategist at Netsmart, sent an email to several parties, including Greg Charles Warren, Chief Operating Officer at CCG, and Noah Nordheimer, President and Chief Executive Officer at CCG, outlining the functions and

3

features that the Netsmart platform could provide to get CCG "up and running." *See* email from Jim Conway to Greg Charles Warren et al, September 9th, 2014 attached as Ex. 1. Mr. Conway promised features including inventory capabilities, such as setting up medication for dispensing, the ability to create a new order for a patient joining the program, and the ability to order doses for a patient and split the total amount to be dispensed into multiple doses, among many other promised capabilities including billing and reporting. *Id.*

10. Based on all of the above representations, on September 30, 2014, CCG executed a three (3) year Term License and Service Agreement ("the License Agreement") with Netsmart, including its myEvolv EHR software and RCM billing services. *See* the License Agreement executed on September 30, 2014 attached as Ex.2.

11. Notwithstanding the fact that the opening date for CCG Baltimore was subsequently pushed to February 2015, Netsmart failed to have the myEvolv software platform ready by that date. In October 2014, Netsmart software implementation staff for the first-time informed CCG management that the software configuration required to support CCG's full medical platform could not be made ready by February 2015; that the full myEvolv EHR software suite would require several additional months to build and implement; and that the full implementation would require deployment in two (2) phases, with Netsmart representatives unable to determine and project the implementation date of Phase Two. This October 2014 disclosure was completely contrary to representations made by Netsmart representatives to CCG prior to execution of the contracts.

4

B.      Netsmart Attempts to Force CCG to Sign a "Beta Agreement"

12.     By January 2015, Netsmart was already well behind with the myEvolv implementation. Without warning, Netsmart approached CCG and informed CCG it must sign an "Early Adopter Agreement." *See* Early Adopter Agreement sent to CCG attached as Ex. 3. This "Beta Agreement" related specifically to the "AM components" of the software that controlled dispensation of medication, including dispensation of "multi meds." Multiple medication dispensing and the requirements for supportive EHR software had already been established to be the core of CCG's business, and were central to the parties' negotiations prior to contract execution.

13.     The Beta Agreement purported to require CCG to acknowledge, months after the initial contracts were signed, that Netsmart's "software has not been completely tested, may contain defects and is licensed to client on an 'as-is' basis." The Beta Agreement further required CCG to acknowledge that CCG is "not entitled to rely on the software for any reason."

14.     Although CCG refused to sign the Beta Agreement, Netsmart's attempt to force CCG to do so, after CCG had already contracted for allegedly fully functional and tested software, demonstrates clearly that Netsmart representatives were keenly aware of and recognized the inherent failures of myEvolv and the potential risks these recognized failures posed to CCG, its business operations, and its patients. Given the imminent opening of CCG Baltimore, CCG had no option but to continue with the delayed roll out of myEvolv as Netsmart had represented.

C.     The myEvolv Software is not Fully Functional Over Two Years Later

15.    Despite Netsmart's ongoing promises, as of January 2016, nearly 24 months after the date of its February 19, 2015 opening, CCG never received fully functional deployment of the complete EHR software platform contracted for with Netsmart. Many promised features were never delivered at all or were not consistently functioning as promised.

16.    There are many examples of these failures, one of the most egregious of which lies with the "multi-med" dispending module. As represented by Netsmart to CCG, one of the core functions myEvolv software is designed to support is dispensation of multiple medications to addiction patients. Industry standard medications include methadone, buprenorphine, vivitrol, and zubsolv - in multiple formats including liquid, tablet, strip, and pill formularies. CCG made clear to Netsmart that the myEvolv software would have to allow the dispensation and tracking of multiple medications, and Netsmart unequivocally represented to CCG that the software could and would perform this function. In addition to representations made by Netsmart representatives prior to executing its contract with CCG, these software capabilities are specifically contained in the September 2014 Agreement Scope of Services, wherein said scope reads in part "…**MyEvolv Addiction Management.** Allows for the tracking of Opioid Recovery Medication Delivery and Inventory. Product can dispense multiple medications from a single station. Creation of Medication Orders for single levels, split dosing, build-up and detoxification.... **Automated Dispensing**: Displays clients dosing schedule, medication history and medical notes. Staff can dispense multiple medications, take-home medication and pharmacy orders ... **Inventory**: Tracks multiple medications. Records all necessary information for auditing purposes: client, dosage, date dispensed, time dispensed, days dispensed and staff. Tracks all stock: opened, unopened and closed."

6

17. The myEvolv software (specifically the AM components of the software) *never* allowed CCG to dispense and bill more than liquid methadone to patients; instead, in instances where a patient has required any other addiction medication, CCG has had to dispense and track the medication on paper, thus defying the reason for having an integrated electronic records system.

18. The myEvolv multi-med dispensing system is so ill-equipped to manage healthcare information that in the Summer of 2016, in reliance upon the myEvolv system of medication dispensing and inventory records, CCG failed a Drug Enforcement Agency ("DEA") Audit because accurate and consistent records were not available to be extracted from the system. CCG was put on notice by the DEA that pending successful reexamination in 90-days, including constructing a complete and accurate reconciliation of its inventory, CCG DEA license would be suspended and its business shut down. DEA agents recommended first and foremost getting a new EHR system that would be able to accurately manage medication inventory. This dire circumstance was a direct result of the flawed myEvolv multi-med dispensing and inventory software. As a result of this circumstance, CCG was forced to retain a third-party accounting firm to perform a Forensic Audit of its entire dispensing history, including manual reconstruction of its complete medication purchase, dispensing, and inventory.

19. Other severe billing issues and errors have included: 1) allowing four months to elapse (and not disclosing to CCG) before re-submitting a single denied billing to third-party payers, a direct and clear breach of the RCM contractual performance requirement; and 2) erroneously sending claims with protected patient health information to the wrong payer agencies for processing.

5297563.1 46250/132720 02/23/2017

20. Currently, CCG is unable to submit approximately $400,000 worth of billing to insurance carriers for payment because of these types of errors which cause continuing harm. These billings include thousands of open claims and services performed during 2015, services for which Netsmart RCM was unable to reconcile due to thousands of "duplicate claims" being entered into the myEvolv billing platform by Netsmart RCM staff and representatives. These include claims and services which Netsmart was unable to reconcile, inside or outside of the myEvolv platform.

21. To date, CCG has paid Netsmart hundreds of thousands of dollars for a partially functioning system. Yet Netsmart's non-performance has cost CCG millions of dollars, due to the inability for staff to enter billable services into the system and due to Netsmart's failures in revenue cycle management, a contracted service. The impact to CCG's business is enormous, and includes lost revenue and reduced payments, inaccurate financial reporting, and problematic reconciliation, and problems administering and maintaining acceptable levels of patient care.

22. As required by paragraph 16(j) of the License Agreement, CCG initiated negotiations to resolve any differences between the parties prior to further exercising their legal rights. These negotiations occurred on February 13, 2017 but did not resolve the issues between the parties.

23. On February 13, 2017, CCG terminated the License Agreement.

8

## COUNT ONE- BREACH OF CONTRACT

24. Plaintiff incorporates by reference the allegations in paragraphs 1 through 23 as if fully set forth herein.

25. CCG entered into a September 30, 2014 contract with Netsmart for the installation and support of the myEvolv system to be fully operational prior to the opening of CCG Baltimore and maintained by Netsmart thereafter. Netsmart did not provide a fully functional system and significant failures occurred throughout CCG's use of the system, accordingly Netsmart breached the contract.

26. CCG has suffered significant financial harm as a result.

WHEREFORE, Plaintiff Concerted Care Group LLC demand judgment against Defendant Netsmart Technologies, Inc., for damages in an amount to be determined at trial but not less than $75,000 plus attorneys' fees, interest and cost.

## COUNT TWO- UNJUST ENRICHMENT

27. Plaintiff incorporates by reference the allegation in paragraphs 1 through 26 as if fully set forth herein.

28. CCG has paid Netsmart over $200,000 for the installation and implementation of the myEvolv system. CCG accordingly conferred a benefit from using Netsmart, a benefit which was known to Netsmart and appreciated by them.

29. Given Netsmart's failure to implement the myEvolv system within the time period required by the contract, it would be inequitable to allow Netsmart to retain the sums paid by CCG.

WHEREFORE, Plaintiff Concerted Care Group LLC demand judgment against Defendant Netsmart Technologies Inc., for damages in an amount to be determined at trial, but not less than $75,000 plus attorneys' fees, interest and cost.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

Date: February 23, 2017

George F. Ritchie
Alexandria K. Montanio
Gordon Feinblatt LLC
The Garret Building
233 E. Redwood Street
Baltimore, Maryland 21202
410-576-4131
410-576-4269 (fax)
gritchie@gfrlaw.com
amontanio@gfrlaw.com

Attorneys for Plaintiff
Concerted Care Group Baltimore, LLC